(Slip Opinion) OCTOBER TERM, 2009 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES *v.* COMSTOCK ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 08–1224.   Argued January 12, 2010—Decided May 17, 2010

Federal law allows a district court to order the civil commitment of a mentally ill, sexually dangerous federal prisoner beyond the date he would otherwise be released.  18 U. S. C. §4248.  The Government instituted civil-commitment proceedings under §4248 against respondents, each of whom moved to dismiss on the ground, *inter alia,* that, in enacting the statute, Congress exceeded its powers under the Necessary and Proper Clause, U. S. Const., Art. I, §8, cl. 18.  Agreeing, the District Court granted dismissal, and the Fourth Circuit affirmed on the legislative-power ground.

*Held:* The Necessary and Proper Clause grants Congress authority sufficient to enact §4248.  Taken together, five considerations compel this conclusion.  Pp. 5–22.

   (1) The Clause grants Congress broad authority to pass laws in furtherance of its constitutionally enumerated powers.  It makes clear that grants of specific federal legislative authority are accompanied by broad power to enact laws that are "convenient, or useful" or "conducive" to the enumerated power's "beneficial exercise," *e.g., McCulloch* v. *Maryland*, 4 Wheat. 316, 413, 418, and that Congress can "legislate on that vast mass of incidental powers which must be involved in the constitution," *id.,* at 421.  In determining whether the Clause authorizes a particular federal statute, there must be "means-ends rationality" between the enacted statute and the source of federal power.  *Sabri* v. *United States*, 541 U. S. 600, 605.  The Constitution "addresse[s]" the "choice of means" "primarily . . . to the judgment of Congress.  If it can be seen that the means adopted are really calculated to attain the end, the degree of their necessity, the extent to which they conduce to the end, the closeness of the relationship between the means adopted and the end to be attained, are matters for

congressional determination alone." *Burroughs* v. *United States*, 290
U. S. 534, 547–548. Thus, although the Constitution nowhere grants
Congress express power to create federal crimes beyond those specifi-
cally enumerated, to punish their violation, to imprison violators, to
provide appropriately for those imprisoned, or to maintain the secu-
rity of those who are not imprisoned but who may be affected by the
federal imprisonment of others, Congress possesses broad authority
to do each of those things under the Clause. Pp. 5–9.

(2) Congress has long been involved in the delivery of mental
health care to federal prisoners, and has long provided for their civil
commitment. See, *e.g.,* Act of Mar. 3, 1855, 10 Stat. 682; Insanity De-
fense Reform Act of 1984, 18 U. S. C. §§4241–4247. A longstanding
history of related federal action does not demonstrate a statute's con-
stitutionality, see, *e.g., Walz* v. *Tax Comm'n of City of New York*, 397
U. S. 664, 678, but can be "helpful in reviewing the substance of a
congressional statutory scheme," *Gonzales* v. *Raich*, 545 U. S. 1, 21,
and, in particular, the reasonableness of the relation between the
new statute and pre-existing federal interests. Section 4248 differs
from earlier statutes in that it focuses directly upon persons who, due
to a mental illness, are sexually dangerous. Many of these individu-
als, however, were likely already subject to civil commitment under
§4246, which, since 1949, has authorized the postsentence detention
of federal prisoners who suffer from a mental illness and who are
thereby dangerous (whether sexually or otherwise). The similarities
between §4246 and §4248 demonstrate that the latter is a modest
addition to a longstanding federal statutory framework. Pp. 9–14.

(3) There are sound reasons for §4248's enactment. The Federal
Government, as custodian of its prisoners, has the constitutional
power to act in order to protect nearby (and other) communities from
the danger such prisoners may pose. Moreover, §4248 is "reasonably
adapted" to Congress' power to act as a responsible federal custodian.
*United States* v. *Darby*, 312 U. S. 100, 121. Congress could have rea-
sonably concluded that federal inmates who suffer from a mental ill-
ness that causes them to "have serious difficulty in refraining from
sexually violent conduct," §4247(a)(6), would pose an especially high
danger to the public if released. And Congress could also have rea-
sonably concluded that a reasonable number of such individuals
would likely not be detained by the States if released from federal
custody. Congress' desire to address these specific challenges, taken
together with its responsibilities as a federal custodian, supports the
conclusion that §4248 satisfies "review for means-end rationality,"
*Sabri, supra,* at 605. Pp. 14–16.

(4) Respondents' contention that §4248 violates the Tenth Amend-
ment because it invades the province of state sovereignty in an area

typically left to state control is rejected. That Amendment does not "reserve to the States" those powers that are "delegated to the United States by the Constitution," including the powers delegated by the Necessary and Proper Clause. See, *e.g., New York* v. *United States*, 505 U. S. 144, 159. And §4248 does not "invade" state sovereignty, but rather requires *accommodation* of state interests: Among other things, it directs the Attorney General to inform the States where the federal prisoner "is domiciled or was tried" of his detention, §4248(d), and gives either State the right, at any time, to assert its authority over the individual, which will prompt the individual's immediate transfer to State custody, §4248(d)(1). In *Greenwood* v. *United States*, 350 U. S. 366, 375–376, the Court rejected a similar challenge to §4248's predecessor, the 1949 statute described above. Because the version of the statute at issue in *Greenwood* was *less* protective of state interests than §4248, *a fortiori*, the current statute does not invade state interests. Pp. 16–18.

(5) Section 4248 is narrow in scope. The Court rejects respondents' argument that, when legislating pursuant to the Necessary and Proper Clause, Congress' authority can be no more than one step removed from a specifically enumerated power. See, *e.g., McCulloch, supra*, at 417. Nor will the Court's holding today confer on Congress a general "police power, which the Founders denied the National Government and reposed in the States." *United States* v. *Morrison*, 529 U. S. 598, 618. Section §4248 has been applied to only a small fraction of federal prisoners, and its reach is limited to individuals already "in the custody of the" Federal Government, §4248(a). Thus, far from a "general police power," §4248 is a reasonably adapted and narrowly tailored means of pursuing the Government's legitimate interest as a federal custodian in the responsible administration of its prison system. See *New York, supra,* at 157. Pp. 18–22.

The Court does not reach or decide any claim that the statute or its application denies equal protection, procedural or substantive due process, or any other constitutional rights. Respondents are free to pursue those claims on remand, and any others they have preserved. P. 22.

551 F. 3d 274, reversed and remanded.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and STEVENS, GINSBURG, and SOTOMAYOR, JJ., joined. KENNEDY, J., and ALITO, J., filed opinions concurring in the judgment. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined in all but Part III–A–1–b.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–1224

## UNITED STATES, PETITIONER *v.* GRAYDON EARL COMSTOCK, JR., ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[May 17, 2010]

JUSTICE BREYER delivered the opinion of the Court.

A federal civil-commitment statute authorizes the Department of Justice to detain a mentally ill, sexually dangerous federal prisoner beyond the date the prisoner would otherwise be released. 18 U. S. C. §4248. We have previously examined similar statutes enacted under state law to determine whether they violate the Due Process Clause. See *Kansas* v. *Hendricks*, 521 U. S. 346, 356–358 (1997); *Kansas* v. *Crane*, 534 U. S. 407 (2002). But this case presents a different question. Here we ask whether the Federal Government has the authority under Article I of the Constitution to enact this federal civil-commitment program or whether its doing so falls beyond the reach of a government "of enumerated powers." *McCulloch* v. *Maryland*, 4 Wheat. 316, 405 (1819). We conclude that the Constitution grants Congress the authority to enact §4248 as "necessary and proper for carrying into Execution" the powers "vested by" the "Constitution in the Government of the United States." Art. I, §8, cl. 18.

## I

The federal statute before us allows a district court to

order the civil commitment of an individual who is currently "in the custody of the [Federal] Bureau of Prisons," §4248, if that individual (1) has previously "engaged or attempted to engage in sexually violent conduct or child molestation," (2) currently "suffers from a serious mental illness, abnormality, or disorder," and (3) "as a result of" that mental illness, abnormality, or disorder is "sexually dangerous to others," in that "he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." §§4247(a)(5)–(6).

In order to detain such a person, the Government (acting through the Department of Justice) must certify to a federal district judge that the prisoner meets the conditions just described, *i.e.*, that he has engaged in sexually violent activity or child molestation in the past and that he suffers from a mental illness that makes him correspondingly dangerous to others. §4248(a). When such a certification is filed, the statute automatically stays the individual's release from prison, *ibid.*, thereby giving the Government an opportunity to prove its claims at a hearing through psychiatric (or other) evidence, §§4247(b)–(c), 4248(b). The statute provides that the prisoner "shall be represented by counsel" and shall have "an opportunity" at the hearing "to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine" the Government's witnesses. §§4247(d), 4248(c).

If the Government proves its claims by "clear and convincing evidence," the court will order the prisoner's continued commitment in "the custody of the Attorney General," who must "make all reasonable efforts to cause" the State where that person was tried, or the State where he is domiciled, to "assume responsibility for his custody, care, and treatment." §4248(d); cf. *Sullivan* v. *Freeman*, 944 F. 2d 334, 337 (CA7 1991). If either State is willing to assume that responsibility, the Attorney General "shall release" the individual "to the appropriate official" of that

State. §4248(d). But if, "notwithstanding such efforts, neither such State will assume such responsibility," then "the Attorney General shall place the person for treatment in a suitable [federal] facility." *Ibid.;* cf. §4247(i)(A).

Confinement in the federal facility will last until either (1) the person's mental condition improves to the point where he is no longer dangerous (with or without appropriate ongoing treatment), in which case he will be released; or (2) a State assumes responsibility for his custody, care, and treatment, in which case he will be transferred to the custody of that State. §§4248(d)(1)–(2). The statute establishes a system for ongoing psychiatric and judicial review of the individual's case, including judicial hearings at the request of the confined person at six-month intervals. §§4247(e)(1)(B), (h).

In November and December 2006, the Government instituted proceedings in the Federal District Court for the Eastern District of North Carolina against the five respondents in this case. Three of the five had previously pleaded guilty in federal court to possession of child pornography, see 507 F. Supp. 2d 522, 526, and n. 2 (2007); §2252A(a), and the fourth had pleaded guilty to sexual abuse of a minor, see *United States* v. *Vigil*, No. 1:99CR00509–001 (D NM, Jan. 26, 2000); §§1153, 2243(a). With respect to each of them, the Government claimed that the respondent was about to be released from federal prison, that he had engaged in sexually violent conduct or child molestation in the past, and that he suffered from a mental illness that made him sexually dangerous to others. App. 38–40, 44–52. During that same time period, the Government instituted similar proceedings against the fifth respondent, who had been charged in federal court with aggravated sexual abuse of a minor, but was found mentally incompetent to stand trial. See *id.,* at 41–43; *United States* v. *Catron*, No. 04–778 (D Ariz., Mar. 27, 2006); §4241(d).

Each of the five respondents moved to dismiss the civil-commitment proceeding on constitutional grounds. They claimed that the commitment proceeding is, in fact, criminal, not civil, in nature and consequently that it violates the Double Jeopardy Clause, the *Ex Post Facto* Clause, and the Sixth and Eighth Amendments. 507 F. Supp. 2d, at 528. They claimed that the statute denies them substantive due process and equal protection of the laws. *Ibid.* They claimed that it violates their procedural due process rights by allowing a showing of sexual dangerousness to be made by clear and convincing evidence, instead of by proof beyond a reasonable doubt. *Ibid.* And, finally, they claimed that, in enacting the statute, Congress exceeded the powers granted to it by Art. I, §8 of the Constitution, including those granted by the Commerce Clause and the Necessary and Proper Clause. 507 F. Supp. 2d, at 528–529.

The District Court, accepting two of the respondents' claims, granted their motion to dismiss. It agreed with respondents that the Constitution requires proof beyond a reasonable doubt, *id.,* at 551–559 (citing *In re Winship*, 397 U. S. 358 (1970)), and it agreed that, in enacting the statute, Congress exceeded its Article I legislative powers, 507 F. Supp. 2d, at 530–551. On appeal, the Court of Appeals for the Fourth Circuit upheld the dismissal on this latter, legislative-power ground. 551 F. 3d 274, 278–284 (2009). It did not decide the standard-of-proof question, nor did it address any of respondents' other constitutional challenges. *Id.,* at 276, n. 1.

The Government sought certiorari, and we granted its request, limited to the question of Congress' authority under Art. I, §8 of the Constitution. Pet. for Cert. i. Since then, two other Courts of Appeals have considered that same question, each deciding it in the Government's favor, thereby creating a split of authority among the Circuits. See *United States* v. *Volungus*, 595 F. 3d 1 (CA1 2010);

*United States* v. *Tom*, 565 F. 3d 497 (CA8 2009).

## II

The question presented is whether the Necessary and Proper Clause, Art. I, §8, cl. 18, grants Congress authority sufficient to enact the statute before us. In resolving that question, we assume, but we do not decide, that other provisions of the Constitution—such as the Due Process Clause—do not prohibit civil commitment in these circumstances. Cf. *Hendricks*, 521 U. S. 346; *Addington* v. *Texas*, 441 U. S. 418 (1979). In other words, we assume for argument's sake that the Federal Constitution would permit a State to enact this statute, and we ask solely whether the Federal Government, exercising its enumerated powers, may enact such a statute as well. On that assumption, we conclude that the Constitution grants Congress legislative power sufficient to enact §4248. We base this conclusion on five considerations, taken together.

*First*, the Necessary and Proper Clause grants Congress broad authority to enact federal legislation. Nearly 200 years ago, this Court stated that the Federal "[G]overnment is acknowledged by all to be one of enumerated powers," *McCulloch*, 4 Wheat., at 405, which means that "[e]very law enacted by Congress must be based on one or more of" those powers, *United States* v. *Morrison*, 529 U. S. 598, 607 (2000). But, at the same time, "a government, entrusted with such" powers "must also be entrusted with ample means for their execution." *McCulloch,* 4 Wheat., at 408. Accordingly, the Necessary and Proper Clause makes clear that the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are "convenient, or useful" or "conducive" to the authority's "beneficial exercise." *Id.,* at 413, 418; see also *id.,* at 421 ("[Congress can] legislate on that vast mass of incidental powers which must be involved in the constitution . . ."). Chief Justice

Marshall emphasized that the word "necessary" does not mean "absolutely necessary." *Id.,* at 413–415 (emphasis deleted); *Jinks* v. *Richland County*, 538 U. S. 456, 462 (2003) ("[W]e long ago rejected the view that the Necessary and Proper Clause demands that an Act of Congress be ' "*absolutely* necessary" ' to the exercise of an enumerated power"). In language that has come to define the scope of the Necessary and Proper Clause, he wrote:

> "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *McCulloch, supra,* at 421.

We have since made clear that, in determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power. *Sabri* v. *United States*, 541 U. S. 600, 605 (2004) (using term "means-ends rationality" to describe the necessary relationship); *ibid.* (upholding Congress' "authority under the Necessary and Proper Clause" to enact a criminal statute in furtherance of the federal power granted by the Spending Clause); see *Gonzales* v. *Raich*, 545 U. S. 1, 22 (2005) (holding that because "Congress had a rational basis" for concluding that a statute implements Commerce Clause power, the statute falls within the scope of congressional "authority to 'make all Laws which shall be necessary and proper' to 'regulate Commerce . . . among the several States'" (ellipsis in original)); see also *United States* v. *Lopez*, 514 U. S. 549, 557 (1995); *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 276 (1981).

Of course, as Chief Justice Marshall stated, a federal

statute, in addition to being authorized by Art. I, §8, must also "not [be] prohibited" by the Constitution. *McCulloch, supra,* at 421. But as we have already stated, the present statute's validity under provisions of the Constitution other than the Necessary and Proper Clause is an issue that is not before us. Under the question presented, the relevant inquiry is simply "whether the means chosen are 'reasonably adapted' to the attainment of a legitimate end under the commerce power" or under other powers that the Constitution grants Congress the authority to implement. *Gonzales, supra,* at 37 (SCALIA, J., concurring in judgment) (quoting *United States* v. *Darby,* 312 U. S. 100, 121 (1941)).

We have also recognized that the Constitution "addresse[s]" the "choice of means"

> "primarily . . . to the judgment of Congress. If it can be seen that the means adopted are really calculated to attain the end, the degree of their necessity, the extent to which they conduce to the end, the closeness of the relationship between the means adopted and the end to be attained, are matters for congressional determination alone." *Burroughs* v. *United States,* 290 U. S. 534, 547–548 (1934).

See also *Lottery Case,* 188 U. S. 321, 355 (1903) ("[T]he Constitution . . . . leaves to Congress a large discretion as to the means that may be employed in executing a given power"); *Morrison, supra,* at 607 (applying a "presumption of constitutionality" when examining the scope of Congressional power); *McCulloch, supra,* at 410, 421.

Thus, the Constitution, which nowhere speaks explicitly about the creation of federal crimes beyond those related to "counterfeiting," "treason," or "Piracies and Felonies committed on the high Seas" or "against the Law of Nations," Art. I, §8, cls. 6, 10; Art. III, §3, nonetheless grants Congress broad authority to create such crimes. See

*McCulloch,* 4 Wheat., at 416 ("All admit that the government may, legitimately, punish any violation of its laws; and yet, this is not among the enumerated powers of Congress"); see also *United States* v. *Fox*, 95 U. S. 670, 672 (1878). And Congress routinely exercises its authority to enact criminal laws in furtherance of, for example, its enumerated powers to regulate interstate and foreign commerce, to enforce civil rights, to spend funds for the general welfare, to establish federal courts, to establish post offices, to regulate bankruptcy, to regulate naturalization, and so forth. Art. I, §8, cls. 1, 3, 4, 7, 9; Amdts. 13–15. See, *e.g., Lottery Case, supra* (upholding criminal statute enacted in furtherance of the Commerce Clause); *Ex parte Yarbrough*, 110 U. S. 651 (1884) (upholding Congress' authority to enact Rev. Stat. §5508, currently 18 U. S. C. §241 (criminalizing civil-rights violations) and Rev. Stat. §5520, currently 42 U. S. C. §1973j (criminalizing voting-rights violations) in furtherance of the Fourteenth and Fifteenth Amendments); *Sabri, supra,* (upholding criminal statute enacted in furtherance of the Spending Clause); *Jinks, supra,* at 462, n. 2 (citing *McCulloch, supra*, at 417) (describing perjury and witness tampering as federal crimes enacted in furtherance of the power to constitute federal tribunals); see also 18 U. S. C. §1691 *et seq.* (postal crimes); §151 *et seq.* (bankruptcy crimes); 8 U. S. C. §§1324–1328 (immigration crimes).

Similarly, Congress, in order to help ensure the enforcement of federal criminal laws enacted in furtherance of its enumerated powers, "can cause a prison to be erected at any place within the jurisdiction of the United States, and direct that all persons sentenced to imprisonment under the laws of the United States shall be confined there." *Ex parte Karstendick*, 93 U. S. 396, 400 (1876). Moreover, Congress, having established a prison system, can enact laws that seek to ensure that system's safe and responsible administration by, for example, requiring

prisoners to receive medical care and educational training, see, *e.g.,* 18 U. S. C. §§4005–4006; §4042(a)(3), and can also ensure the safety of the prisoners, prison workers and visitors, and those in surrounding communities by, for example, creating further criminal laws governing entry, exit, and smuggling, and by employing prison guards to ensure discipline and security. See, *e.g.,* §1791 (prohibiting smuggling contraband); §751 *et seq.* (prohibiting escape and abetting thereof); 28 CFR §541.10 *et seq.* (2009) (inmate discipline).

Neither Congress' power to criminalize conduct, nor its power to imprison individuals who engage in that conduct, nor its power to enact laws governing prisons and prisoners, is explicitly mentioned in the Constitution. But Congress nonetheless possesses broad authority to do each of those things in the course of "carrying into Execution" the enumerated powers "vested by" the "Constitution in the Government of the United States," Art. I, §8, cl. 18—authority granted by the Necessary and Proper Clause.

*Second,* the civil-commitment statute before us constitutes a modest addition to a set of federal prison-related mental-health statutes that have existed for many decades. We recognize that even a longstanding history of related federal action does not demonstrate a statute's constitutionality. See, *e.g., Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664, 678 (1970) ("[N]o one acquires a vested or protected right in violation of the Constitution by long use . . ."); cf. *Morrison*, 529 U. S., at 612–614 (legislative history is neither necessary nor sufficient with respect to Art. I analysis). A history of involvement, however, can nonetheless be "helpful in reviewing the substance of a congressional statutory scheme," *Gonzales,* 545 U. S., at 21; *Walz, supra,* at 678, and, in particular, the reasonableness of the relation between the new statute and pre-existing federal interests.

Here, Congress has long been involved in the delivery of

mental health care to federal prisoners, and has long provided for their civil commitment. In 1855 it established Saint Elizabeth's Hospital in the District of Columbia to provide treatment to "the insane of the army and navy . . . and of the District of Columbia." Act of Mar. 3, 1855, 10 Stat. 682; 39 Stat. 309. In 1857 it provided for confinement at Saint Elizabeth's of any person within the District of Columbia who had been "charged with [a] crime" and who was "insane" or later became "insane during the continuance of his or her sentence in the United States penitentiary." Act of Feb. 7, 1857, §§5–6, 11 Stat. 158; see 17 Op. Atty. Gen. 211, 212–213 (1881). In 1874, expanding the geographic scope of its statutes, Congress provided for civil commitment in federal facilities (or in state facilities if a State so agreed) of "*all* persons who have been or shall be convicted of any offense in *any* court of the United States" and who are or "shall become" insane "during the term of their imprisonment." Act of June 23, 1874, ch. 465, 18 Stat. 251 (emphasis added). And in 1882 Congress provided for similar commitment of those "*charged*" with federal offenses who become "insane" while in the "custody" of the United States. Act of Aug. 7, 1882, 22 Stat. 330 (emphasis added). Thus, over the span of three decades, Congress created a national, federal civil-commitment program under which any person who was either charged with or convicted of any federal offense in any federal court could be confined in a federal mental institution.

These statutes did not raise the question presented here, for they all provided that commitment in a federal hospital would end upon the completion of the relevant "terms" of federal "imprisonment" as set forth in the underlying criminal sentence or statute. §§2–3, 18 Stat. 252; see 35 Op. Atty. Gen. 366, 368 (1927); cf. 30 Op. Atty. Gen. 569, 571 (1916). But in the mid-1940's that proviso was eliminated.

In 1945 the Judicial Conference of the United States proposed legislative reforms of the federal civil-commitment system. The Judicial Conference based its proposals upon what this Court has described as a "long study by a conspicuously able committee" (chaired by Judge Calvert Magruder and whose members included Judge Learned Hand), involving consultation "with federal district and circuit judges" across the country as well as with the Department of Justice. *Greenwood* v. *United States*, 350 U. S. 366, 373 (1956); *Greenwood* v. *United States*, 219 F. 2d 376, 380–384 (CA8 1955) (describing the committee's work). The committee studied, among other things, the "serious problem faced by the Bureau of Prisons, namely, what to do with insane criminals upon the expiration of their terms of confinement, where it would be dangerous to turn them loose upon society and where no state will assume responsibility for their custody." Judicial Conference, Report of Committee to Study Treatment Accorded by Federal Courts to Insane Persons Charged with Crime 11 (1945) (hereinafter Committee Report), App. 73. The committee provided examples of instances in which the Bureau of Prisons had struggled with the problem of "'paranoid'" and "'threatening'" individuals whom no State would accept. *Id.,* at 9, App. 71. And it noted that, in the Bureau's "[e]xperience," States would not accept an "appreciable number" of "mental[ly] incompetent" individuals "nearing expiration" of their prison terms, because of their "lack of legal residence in any State," even though those individuals "ought not . . . be at large because they constitute a menace to public safety." H. R. Rep. No. 1319, 81st Cong., 1st Sess., 2 (1949) (statement of James V. Bennett, Director); see also Letter from Bennett to Judge Magruder, attachment to Committee Report, App. 83–88. The committee, hence the Judicial Conference, therefore recommended that Congress enact "some provision of law authorizing the continued confine-

ment of such persons after their sentences expired."
Committee Report 11, App. 73; see also Report of the
Judicial Conference of Senior Circuit Judges 13 (1945).

Between 1948 and 1949, following its receipt of the
Judicial Conference report, Congress modified the law.
See Act of June 25, 1948, 62 Stat. 855, 18 U. S. C. §§4241–
4243 (1952 ed.); Act of Sept. 7, 1949, 63 Stat. 686, 18
U. S. C. §§4244–4248. It provided for the civil commit-
ment of individuals who are, or who become, mentally
incompetent at any time after their arrest and before the
expiration of their federal sentence, §§4241, 4244, 4247–
4248; and it set forth various procedural safeguards,
§§4242, 4246, 4247. With respect to an individual whose
prison term is about to expire, it specified the following:

> "Whenever the Director of the Bureau of Prisons
> shall certify that a prisoner whose sentence is about to
> expire has been examined [and] . . . in the judgment of
> the Director and the board of examiners the prisoner
> is insane or mentally incompetent, and . . . if released
> he will probably endanger the safety of the officers,
> the property, or other interests of the United States,
> and that suitable arrangements for the custody and
> care of the prisoner are not otherwise available, the
> Attorney General shall transmit the certificate to . . .
> the court for the district in which the prisoner is con-
> fined. Whereupon the court shall cause the prisoner
> to be examined . . . and shall . . . hold a hearing . . . . If
> upon such hearing the court shall determine that the
> conditions specified above exist, the court may commit
> the prisoner to the custody of the Attorney General or
> his authorized representative." §4247.

The precondition that the mentally ill individual's release
would "probably endanger the safety of the officers, the
property, or other interests of the United States" was
uniformly interpreted by the Judiciary to mean that his

"release would endanger the safety of persons, property or the public interest in general—not merely the interests peculiar to the United States as such." *United States* v. *Curry*, 410 F. 2d 1372, 1374 (CA4 1969); see also *Royal* v. *United States*, 274 F. 2d 846, 851–852 (CA10 1960).

In 1984, Congress modified these basic statutes. See Insanity Defense Reform Act of 1984, 98 Stat. 2057, 18 U. S. C. §§4241–4247 (2006 ed.). As relevant here, it altered the provision just discussed, regarding the prisoner's danger to the "interests of the United States," to conform more closely to the then-existing judicial interpretation of that language, *i.e.*, it altered the language so as to authorize (explicitly) civil commitment if, in addition to the other conditions, the prisoner's "release would create a substantial risk of bodily injury to another person or serious damage to the property of another." §4246(d).

Congress also elaborated upon the required condition "that suitable arrangements . . . are not otherwise available" by directing the Attorney General to seek alternative placement in state facilities, as we have set forth above. See *ibid.; supra,* at 2–3. With these modifications, the statutes continue to authorize the civil commitment of individuals who are both mentally ill and dangerous, once they have been charged with, or convicted of, a federal crime. §§4241(d), 4246; see also §4243(d). They continue to provide for the *continued* civil commitment of those individuals when they are "due for release" from federal custody because their "sentence is about to expire." §4246. And, as we have previously set forth, they establish various procedural and other requirements. *E.g.*, §4247.

In 2006, Congress enacted the particular statute before us. §302, 120 Stat. 619, 18 U. S. C. §4248. It differs from earlier statutes in that it focuses directly upon persons who, due to a mental illness, are sexually dangerous. Notably, many of these individuals were likely already subject to civil commitment under §4246, which, since

1949, has authorized the postsentence detention of federal prisoners who suffer from a mental illness and who are thereby dangerous (whether sexually or otherwise). But cf. H. R. Rep. No. 109–218, pt. 1, p. 29 (2005). Aside from its specific focus on sexually dangerous persons, §4248 is similar to the provisions first enacted in 1949. Cf. §4246. In that respect, it is a modest addition to a longstanding federal statutory framework, which has been in place since 1855.

*Third*, Congress reasonably extended its longstanding civil-commitment system to cover mentally ill and sexually dangerous persons who are already in federal custody, even if doing so detains them beyond the termination of their criminal sentence. For one thing, the Federal Government is the custodian of its prisoners. As federal custodian, it has the constitutional power to act in order to protect nearby (and other) communities from the danger federal prisoners may pose. Cf. *Youngberg* v. *Romeo*, 457 U. S. 307, 320 (1982) ("In operating an institution such as [a prison system], there are occasions in which it is necessary for the State to restrain the movement of residents— for example, to protect them *as well as others* from violence" (emphasis added)). Indeed, at common law, one "who takes charge of a third person" is "under a duty to exercise reasonable care to control" that person to prevent him from causing reasonably foreseeable "bodily harm to others." Restatement (Second) of Torts §319, p. 129 (1963–1964); see *Volungus*, 595 F. 3d, at 7–8 (citing cases); see also *United States* v. *S. A.*, 129 F. 3d 995, 999 (CA8 1997) ("[Congress enacted §4246] to avert the public danger likely to ensue from the release of mentally ill and dangerous detainees"). If a federal prisoner is infected with a communicable disease that threatens others, surely it would be "necessary and proper" for the Federal Government to take action, pursuant to its role as federal custodian, to refuse (at least until the threat diminishes)

to release that individual among the general public, where he might infect others (even if not threatening an interstate epidemic, cf. Art. I, §8, cl. 3). And if confinement of such an individual is a "necessary and proper" thing to do, then how could it not be similarly "necessary and proper" to confine an individual whose mental illness threatens others to the same degree?

Moreover, §4248 is "reasonably adapted," *Darby*, 312 U. S., at 121, to Congress' power to act as a responsible federal custodian (a power that rests, in turn, upon federal criminal statutes that legitimately seek to implement constitutionally enumerated authority, see *supra,* at 7–8). Congress could have reasonably concluded that federal inmates who suffer from a mental illness that causes them to "have serious difficulty in refraining from sexually violent conduct," §4247(a)(6), would pose an especially high danger to the public if released. Cf. H. R. Rep. No. 109–218, at 22–23. And Congress could also have reasonably concluded (as detailed in the Judicial Conference's report) that a reasonable number of such individuals would likely *not* be detained by the States if released from federal custody, in part because the Federal Government itself severed their claim to "legal residence in any State" by incarcerating them in remote federal prisons. H. R. Rep. No. 1319, at 2; Committee Report 7–11, App. 69–75; cf. *post,* at 6 (KENNEDY, J., concurring in judgment). Here Congress' desire to address the specific challenges identified in the Reports cited above, taken together with its responsibilities as a federal custodian, supports the conclusion that §4248 satisfies "review for means-end rationality," *i.e.*, that it satisfies the Constitution's insistence that a federal statute represent a rational means for implementing a constitutional grant of legislative authority. *Sabri,* 541 U. S., at 605 (citing *McCulloch*, 4 Wheat. 316). See *Jinks,* 538 U. S., at 462–463 (opinion for the Court by SCALIA, J.) (holding that a statute is authorized by the

Necessary and Proper Clause when it "provides an alternative to [otherwise] unsatisfactory options" that are "obviously inefficient").

*Fourth*, the statute properly accounts for state interests. Respondents and the dissent contend that §4248 violates the Tenth Amendment because it "invades the province of state sovereignty" in an area typically left to state control. *New York* v. *United States*, 505 U. S. 144, 155 (1992); see Brief for Respondents 35–47; *post,* at 7–8, 19–23 (THOMAS, J., dissenting). See also *Jackson* v. *Indiana*, 406 U. S. 715, 736 (1972) ("The States have traditionally exercised broad power to commit persons found to be mentally ill"). But the Tenth Amendment's text is clear: "The powers *not delegated to the United States* by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." (Emphasis added.) The powers "delegated to the United States by the Constitution" include those specifically enumerated powers listed in Article I along with the implementation authority granted by the Necessary and Proper Clause. Virtually by definition, these powers are not powers that the Constitution "reserved to the States." See *New York, supra,* at 156, 159 ("[I]f a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States . . . ." "In the end . . . it makes no difference whether one views the question at issue in these cases as one of ascertaining the limits of the power delegated to the Federal Government under the affirmative provisions of the Constitution or one of discerning the core of sovereignty retained by the States under the Tenth Amendment"); *Darby, supra*, at 123–124; see also *Hodel*, 452 U. S., at 276–277, 281; *Maryland* v. *Wirtz*, 392 U. S. 183, 195–196 (1968); *Lambert* v. *Yellowley*, 272 U. S. 581, 596 (1926).

Nor does this statute invade state sovereignty or otherwise improperly limit the scope of "powers that remain

with the States." *Post,* at 7 (THOMAS, J., dissenting). To the contrary, it requires *accommodation* of state interests: The Attorney General must inform the State in which the federal prisoner "is domiciled or was tried" that he is detaining someone with respect to whom those States may wish to assert their authority, and he must encourage those States to assume custody of the individual. §4248(d). He must also immediately "release" that person "to the appropriate official of" either State "if such State will assume [such] responsibility." *Ibid.* And either State has the right, at any time, to assert its authority over the individual, which will prompt the individual's immediate transfer to State custody. §4248(d)(1). Respondents contend that the States are nonetheless "powerless to *prevent* the detention of their citizens under §4248, even if detention is contrary to the States' policy choices." Brief for Respondents 11 (emphasis added). But that is not the most natural reading of the statute, see §§4248(d)(1)–(e), and the Solicitor General acknowledges that "the Federal Government would have no appropriate role" with respect to an individual covered by the statute once "the transfer to State responsibility and State control has occurred." Tr. of Oral Arg. 9.

In *Greenwood,* 350 U. S. 366, the Court rejected a challenge to the current statute's predecessor—*i.e.,* to the 1949 statute we described above, *supra,* at 11–12. The petitioners in that case claimed, like the respondents here, that the statute improperly interfered with state sovereignty. See Brief for Petitioner in *Greenwood* v. *United States,* O. T. 1955, No. 460, pp. 2, 18–29. But the Court rejected that argument. See *Greenwood, supra,* at 375–376. And the version of the statute at issue in *Greenwood* was *less* protective of state interests than the current statute. That statute authorized federal custody so long as "*suitable* arrangements" were "not otherwise available" in a State or otherwise. 63 Stat. 687 (emphasis added). Cf. Brief for

Petitioner in *Greenwood, supra,* at 25 ("What has really happened is that the Federal government has been dissatisfied with the care given by the states to those mentally incompetent who have been released by the Federal authorities"). Here, by contrast, as we have explained, §4248 requires the Attorney General to encourage the relevant States to take custody of the individual without inquiring into the "suitability" of their intended care or treatment, and to relinquish federal authority whenever a State asserts its own. §4248(d). Thus, if the statute at issue in *Greenwood* did not invade state interests, then, *a fortiori*, neither does §4248.

*Fifth*, the links between §4248 and an enumerated Article I power are not too attenuated. Neither is the statutory provision too sweeping in its scope. Invoking the cautionary instruction that we may not "pile inference upon inference" in order to sustain congressional action under Article I, *Lopez*, 514 U. S., at 567, respondents argue that, when legislating pursuant to the Necessary and Proper Clause, Congress' authority can be no more than one step removed from a specifically enumerated power. See Brief for Respondents 21–22; Tr. of Oral Arg. 27–28. But this argument is irreconcilable with our precedents. Again, take *Greenwood* as an example. In that case we upheld the (likely indefinite) civil commitment of a mentally incompetent federal defendant who was accused of robbing a United States Post Office. 350 U. S., at 369, 375. The underlying enumerated Article I power was the power to "Establish Post Offices and Post Roads." Art. I, §8, cl. 7. But, as Chief Justice Marshall recognized in *McCulloch*,

> "the power 'to establish post offices and post roads' . . . is executed by the single act of *making* the establishment. . . . [F]rom this has been inferred the power and duty of *carrying* the mail along the post road,

> from one post office to another. And, from
> this *implied* power, has *again* been inferred the right
> to *punish* those who steal letters from the post office,
> or rob the mail." 4 Wheat., at 417 (emphasis added).

And, as we have explained, from the implied power to
punish we have *further* inferred both the power to im-
prison, see *supra,* at 8–9, and, in *Greenwood,* the federal
civil-commitment power.

Our necessary and proper jurisprudence contains multi-
ple examples of similar reasoning. For example, in *Sabri*
we observed that "Congress has authority under the
Spending Clause to appropriate federal moneys" and that
it therefore "has corresponding authority under the Neces-
sary and Proper Clause to see to it that taxpayer dollars"
are not "siphoned off" by "corrupt public officers." 541
U. S., at 605 (citation omitted). We then further held that,
in aid of that implied power to criminalize graft of "tax-
payer dollars," Congress has the *additional* prophylactic
power to criminalize bribes or kickbacks even when the
stolen funds have not been "traceably skimmed from
specific federal payments." *Ibid.* Similarly, in *United
States* v. *Hall*, 98 U. S. 343 (1879), we held that the Neces-
sary and Proper Clause grants Congress the power, in
furtherance of Art. I, §8, cls. 11–13, to award "pensions to
the wounded and disabled" soldiers of the armed forces
and their dependents, 98 U. S. at 351; and from that im-
plied power we further inferred the "[i]mplied power" "to
pass laws to . . . punish" anyone who fraudulently appro-
priated such pensions, *id.,* at 346. See also *Stewart* v.
*Kahn*, 11 Wall. 493, 506–507 (1871).

Indeed even the dissent acknowledges that Congress
has the implied power to criminalize any conduct that
might interfere with the exercise of an enumerated power,
and also the additional power to imprison people who
violate those (inferentially authorized) laws, and the

additional power to provide for the safe and reasonable
management of those prisons, and the additional power to
regulate the prisoners' behavior even after their release.
See *post,* at 12–13, 17, n. 11.  Of course, each of those
powers, like the powers addressed in *Sabri, Hall,* and
*McCulloch,* is ultimately "derived from" an enumerated
power, *Hall, supra,* at 345.  And, as the dissent agrees,
that enumerated power is "the enumerated power that
justifies the defendant's statute of conviction," *post,* at 17,
n. 11.  Neither we nor the dissent can point to a single
specific enumerated power "that justifies a criminal de-
fendant's arrest or conviction," *post,* at 12, in *all* cases
because Congress relies on different enumerated powers
(often, but not exclusively, its Commerce Clause power) to
enact its various federal criminal statutes, see *supra,* at 7–
8.  But every such statute must itself be legitimately
predicated on an enumerated power.  And the same enu-
merated power that justifies the creation of a federal
criminal statute, and that justifies the additional implied
federal powers that the dissent considers legitimate, justi-
fies civil commitment under §4248 as well.  See *supra,* at
14–16.  Thus, we must reject respondents' argument that
the Necessary and Proper Clause permits no more than a
single step between an enumerated power and an Act of
Congress.

Nor need we fear that our holding today confers on
Congress a general "police power, which the Founders
denied the National Government and reposed in the
States." *Morrison*, 529 U. S., at 618.  As the Solicitor
General repeatedly confirmed at oral argument, §4248 is
narrow in scope.  It has been applied to only a small frac-
tion of federal prisoners.  See Tr. of Oral Arg. 24–25 (105
individuals have been subject to §4248 out of over 188,000
federal inmates); see also Dept. of Justice, Bureau of
Justice Statistics, W. Sabol, H. West, & M. Cooper, Pris-
oners in 2008, p. 8 (rev. Apr. 2010) (Table 8), online at

http://bjs.ojp.usdoj.gov/content/pub/pdf/p08.pdf/ (as visited May 4, 2010, and available in Clerk of Court's case file). And its reach is limited to individuals already "in the custody of the" Federal Government. §4248(a); Tr. of Oral Arg. 7 ("[Federal authority for §4248] has always depended on the fact of Federal custody, on the fact that this person has entered the criminal justice system . . ."). Indeed, the Solicitor General argues that "the Federal Government would not have . . . the power to commit a person who . . . has been released from prison and whose period of supervised release is also completed." *Id.,* at 9. Thus, far from a "general police power," §4248 is a reasonably adapted and narrowly tailored means of pursuing the Government's legitimate interest as a federal custodian in the responsible administration of its prison system.

To be sure, as we have previously acknowledged,

> "The Federal Government undertakes activities today that would have been unimaginable to the Framers in two senses; first, because the Framers would not have conceived that *any* government would conduct such activities; and second, because the Framers would not have believed that the *Federal* Government, rather than the States, would assume such responsibilities. Yet the powers conferred upon the Federal Government by the Constitution were phrased in language broad enough to allow for the expansion of the Federal Government's role." *New York*, 505 U. S., at 157.

The Framers demonstrated considerable foresight in drafting a Constitution capable of such resilience through time. As Chief Justice Marshall observed nearly 200 years ago, the Necessary and Proper Clause is part of "a constitution intended to endure for ages to come, and, consequently, to be adapted to the various crises of human affairs." *McCulloch*, 4 Wheat., at 415 (emphasis deleted).

\*     \*     \*

We take these five considerations together. They include: (1) the breadth of the Necessary and Proper Clause, (2) the long history of federal involvement in this arena, (3) the sound reasons for the statute's enactment in light of the Government's custodial interest in safeguarding the public from dangers posed by those in federal custody, (4) the statute's accommodation of state interests, and (5) the statute's narrow scope. Taken together, these considerations lead us to conclude that the statute is a "necessary and proper" means of exercising the federal authority that permits Congress to create federal criminal laws, to punish their violation, to imprison violators, to provide appropriately for those imprisoned, and to maintain the security of those who are not imprisoned but who may be affected by the federal imprisonment of others. The Constitution consequently authorizes Congress to enact the statute.

We do not reach or decide any claim that the statute or its application denies equal protection of the laws, procedural or substantive due process, or any other rights guaranteed by the Constitution. Respondents are free to pursue those claims on remand, and any others they have preserved.

The judgment of the Court of Appeals for the Fourth Circuit with respect to Congress' power to enact this statute is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 08–1224

———————

## UNITED STATES, PETITIONER *v.* GRAYDON EARL COMSTOCK, JR., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[May 17, 2010]

JUSTICE KENNEDY, concurring in the judgment.

The Court is correct, in my view, to hold that the challenged portions of 18 U. S. C. §4248 are necessary and proper exercises of congressional authority.

Respondents argue that congressional authority under the Necessary and Proper Clause can be no more than one step removed from an enumerated power. This is incorrect. When the inquiry is whether a federal law has sufficient links to an enumerated power to be within the scope of federal authority, the analysis depends not on the number of links in the congressional-power chain but on the strength of the chain.

Concluding that a relation can be put into a verbal formulation that fits somewhere along a causal chain of federal powers is merely the beginning, not the end, of the constitutional inquiry. See *United States* v. *Lopez*, 514 U. S. 549, 566–567 (1995). The inferences must be controlled by some limitations lest, as Thomas Jefferson warned, congressional powers become completely unbounded by linking one power to another *ad infinitum* in a veritable game of "'this is the house that Jack built.'" Letter from Thomas Jefferson to Edward Livingston (Apr. 30, 1800), 31 The Papers of Thomas Jefferson 547 (B. Oberg ed. 2004); see also *United States* v. *Patton,* 451 F. 3d 615, 628 (CA10 2006).

This separate writing serves two purposes. The first is to withhold assent from certain statements and propositions of the Court's opinion. The second is to caution that the Constitution does require the invalidation of congressional attempts to extend federal powers in some instances.

I

The Court concludes that, when determining whether Congress has the authority to enact a specific law under the Necessary and Proper Clause, we look "to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *Ante*, at 6 (suggesting that *Sabri* v. *United States*, 541 U. S. 600, 605 (2004), adopts a "means-ends rationality" test).

The terms "rationally related" and "rational basis" must be employed with care, particularly if either is to be used as a stand-alone test. The phrase "rational basis" most often is employed to describe the standard for determining whether legislation that does not proscribe fundamental liberties nonetheless violates the Due Process Clause. Referring to this due process inquiry, and in what must be one of the most deferential formulations of the standard for reviewing legislation in all the Court's precedents, the Court has said: "But the law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Williamson* v. *Lee Optical of Okla., Inc.*, 348 U. S. 483, 487–488 (1955). This formulation was in a case presenting a due process challenge and a challenge to a State's exercise of its own powers, powers not confined by the principles that control the limited nature of our National Government. The phrase, then, should not be extended uncritically to the

issue before us.

The operative constitutional provision in this case is the Necessary and Proper Clause. This Court has not held that the *Lee Optical* test, asking if "it might be thought that the particular legislative measure was a rational way to correct" an evil, is the proper test in this context. Rather, under the Necessary and Proper Clause, application of a "rational basis" test should be at least as exacting as it has been in the Commerce Clause cases, if not more so. Indeed, the cases the Court cites in the portion of its opinion referring to "rational basis" are predominantly Commerce Clause cases, and none are due process cases. See *ante,* at 6 (citing *Gonzales* v. *Raich*, 545 U. S. 1 (2005); *Lopez, supra; Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 276 (1981)).

There is an important difference between the two questions, but the Court does not make this distinction clear. *Raich*, *Lopez*, and *Hodel* were all Commerce Clause cases. Those precedents require a tangible link to commerce, not a mere conceivable rational relation, as in *Lee Optical*. "'[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so.'" *Lopez*, *supra*, at 557, n. 2 (quoting *Hodel*, *supra,* at 311 (Rehnquist, J., concurring in judgment)). The rational basis referred to in the Commerce Clause context is a demonstrated link in fact, based on empirical demonstration. While undoubtedly deferential, this may well be different from the rational-basis test as *Lee Optical* described it.

The Court relies on *Sabri, supra,* for its conclusion that a "means-ends rationality" is all that is required for a power to come within the Necessary and Proper Clause's reach. See *ante*, at 6. *Sabri* only refers to "means-ends rationality" in a parenthetical describing the holding in *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819); it certainly did not import the *Lee Optical* rational-basis test into this

arena through such a parenthetical. See *Sabri, supra,* at 612 (THOMAS, J., concurring in judgment) ("A statute can have a 'rational' connection to an enumerated power without being obviously or clearly tied to that enumerated power"). It should be remembered, moreover, that the spending power is not designated as such in the Constitution but rather is implied from the power to lay and collect taxes and other specified exactions in order, among other purposes, "to pay the Debts and provide for the common Defence and general Welfare of the United States." Art. I, §8, cl. 1; see *South Dakota* v. *Dole,* 483 U. S. 203, 206 (1987). The limits upon the spending power have not been much discussed, but if the relevant standard is parallel to the Commerce Clause cases, then the limits and the analytic approach in those precedents should be respected.

A separate concern stems from the Court's explanation of the Tenth Amendment. *Ante,* at 16. I had thought it a basic principle that the powers reserved to the States consist of the whole, undefined residuum of power remaining after taking account of powers granted to the National Government. The Constitution delegates limited powers to the National Government and then reserves the remainder for the States (or the people), not the other way around, as the Court's analysis suggests. And the powers reserved to the States are so broad that they remain undefined. Residual power, sometimes referred to (perhaps imperfectly) as the police power, belongs to the States and the States alone.

It is correct in one sense to say that if the National Government has the power to act under the Necessary and Proper Clause then that power is not one reserved to the States. But the precepts of federalism embodied in the Constitution inform which powers are properly exercised by the National Government in the first place. See *Lopez,* 514 U. S., at 580–581 (KENNEDY, J., concurring); see also *McCulloch, supra,* at 421 (powers "consist[ent] with the

letter and spirit of the constitution, are constitutional"). It is of fundamental importance to consider whether essential attributes of state sovereignty are compromised by the assertion of federal power under the Necessary and Proper Clause; if so, that is a factor suggesting that the power is not one properly within the reach of federal power.

The opinion of the Court should not be interpreted to hold that the only, or even the principal, constraints on the exercise of congressional power are the Constitution's express prohibitions. The Court's discussion of the Tenth Amendment invites the inference that restrictions flowing from the federal system are of no import when defining the limits of the National Government's power, as it proceeds by first asking whether the power is within the National Government's reach, and if so it discards federalism concerns entirely.

These remarks explain why the Court ignores important limitations stemming from federalism principles. Those principles are essential to an understanding of the function and province of the States in our constitutional structure.

## II

As stated at the outset, in this case Congress has acted within its powers to ensure that an abrupt end to the federal detention of prisoners does not endanger third parties. Federal prisoners often lack a single home State to take charge of them due to their lengthy prison stays, so it is incumbent on the National Government to act. This obligation, parallel in some respects to duties defined in tort law, is not to put in motion a particular force (here an unstable and dangerous person) that endangers others. Having acted within its constitutional authority to detain the person, the National Government can acknowledge a duty to ensure that an abrupt end to the detention does not prejudice the States and their citizens.

I would note, as the Court's opinion does, that §4248 does not supersede the right and responsibility of the States to identify persons who ought to be subject to civil confinement. The federal program in question applies only to those in federal custody and thus involves little intrusion upon the ordinary processes and powers of the States.

This is not a case in which the National Government demands that a State use its own governmental system to implement federal commands. See *Printz* v. *United States*, 521 U. S. 898 (1997). It is not a case in which the National Government relieves the States of their own primary responsibility to enact laws and policies for the safety and well being of their citizens. See *United States* v. *Morrison*, 529 U. S. 598 (2000). Nor is it a case in which the exercise of national power intrudes upon functions and duties traditionally committed to the State. See *Lopez, supra*, at 580–581 (KENNEDY, J., concurring).

Rather, this is a discrete and narrow exercise of authority over a small class of persons already subject to the federal power. Importantly, §4248(d) requires the Attorney General to release any civil detainee "to the appropriate official of the State in which the person is domiciled or was tried if such State will assume responsibility for his custody, care, and treatment," providing a strong assurance that the proffered reason for the legislation's necessity is not a mere artifice.

With these observations, I concur in the judgment of the Court.

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–1224

_____

## UNITED STATES, PETITIONER *v.* GRAYDON EARL COMSTOCK, JR., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[May 17, 2010]

JUSTICE ALITO, concurring in the judgment.

I am concerned about the breadth of the Court's language, see *ante*, at 2–4 (KENNEDY, J., concurring in judgment), and the ambiguity of the standard that the Court applies, see *post*, at 9 (THOMAS, J., dissenting), but I am persuaded, on narrow grounds, that it was "necessary and proper" for Congress to enact the statute at issue in this case, 18 U. S. C. §4248, in order to "carr[y] into Execution" powers specifically conferred on Congress by the Constitution, see Art. I, §8, cl. 18.

Section 4248 was enacted to protect the public from federal prisoners who suffer from "a serious mental illness, abnormality, or disorder" and who, if released, would have "serious difficulty in refraining from sexually violent conduct or child molestation." See §§4247(a)(5), (6), 4248(d). Under this law, if neither the State of a prisoner's domicile nor the State in which the prisoner was tried will assume the responsibility for the prisoner's "custody, care, and treatment," the Federal Government is authorized to undertake that responsibility. §4248(d). The statute recognizes that, in many cases, no State will assume the heavy financial burden of civilly committing a dangerous federal prisoner who, as a result of lengthy federal incarceration, no longer has any substantial ties to any State.

I entirely agree with the dissent that "[t]he Necessary and Proper Clause empowers Congress to enact only those laws that 'carr[y] into Execution' one or more of the federal powers enumerated in the Constitution," *post*, at 1, but §4248 satisfies that requirement because it is a necessary and proper means of carrying into execution the enumerated powers that support the federal criminal statutes under which the affected prisoners were convicted. The Necessary and Proper Clause provides the constitutional authority for most federal criminal statutes. In other words, most federal criminal statutes rest upon a congressional judgment that, in order to execute one or more of the powers conferred on Congress, it is necessary and proper to criminalize certain conduct, and in order to do that it is obviously necessary and proper to provide for the operation of a federal criminal justice system and a federal prison system.

All of this has been recognized since the beginning of our country. The First Congress enacted federal criminal laws,[1] created federal law enforcement and prosecutorial positions,[2] established a federal court system,[3] provided for the imprisonment of persons convicted of federal crimes,[4] and gave United States marshals the responsibil-

---

[1] See, *e.g.*, ch. 9, 1 Stat. 112 ("An Act for the Punishment of certain Crimes against the United States").

[2] Ch. 20, §35, *id.,* at 92 ("[T]here shall be appointed in each district a meet person learned in the law to act as attorney for the United States in such district, . . . whose duty it shall be to prosecute in such district all delinquents for crimes and offences, cognizable under the authority of the United States").

[3] §1, *id.,* at 73 ("An Act to establish the Judicial Courts of the United States").

[4] See, *e.g.*, §9, *id.,* at 76–77 (providing that the federal district courts shall have exclusive jurisdiction over "all crimes and offences that shall be cognizable under the authority of the United States, . . . where no other punishment than whipping, not exceeding thirty stripes, a fine not exceeding one hundred dollars, or a term of imprisonment not

ity of securing federal prisoners.[5]

The only additional question presented here is whether, in order to carry into execution the enumerated powers on which the federal criminal laws rest, it is also necessary and proper for Congress to protect the public from dangers created by the federal criminal justice and prison systems. In my view, the answer to that question is "yes." Just as it is necessary and proper for Congress to provide for the apprehension of escaped federal prisoners, it is necessary and proper for Congress to provide for the civil commitment of dangerous federal prisoners who would otherwise escape civil commitment as a result of federal imprisonment.

Some years ago, a distinguished study group created by the Judicial Conference of the United States found that, in a disturbing number of cases, no State was willing to assume the financial burden of providing for the civil commitment of federal prisoners who, if left at large after the completion of their sentences, would present a danger to any communities in which they chose to live or visit. See *ante*, at 11; *Greenwood* v. *United States*, 350 U. S. 366, 373–374 (1956). These federal prisoners, having been held

---

exceeding six months, is to be inflicted"); see also J. Roberts, The Federal Bureau of Prisons: Its Mission, Its History, and Its Partnership With Probation and Pretrial Services, 61 Fed. Probation 53 (1997) (explaining that federal prisoners were originally housed in state and county facilities on a contract basis).

[5] See ch. 20, §27, 1 Stat. 87 ("[A] marshal shall be appointed in and for each district for the term of four years, . . . whose duty it shall be to attend the district and circuit courts when sitting therein, . . . [a]nd to execute throughout the district, all lawful precepts directed to him, and issued under the authority of the United States"); *id.,* at 88 ("[T]he marshal shall be held answerable for the delivery to his successor of all prisoners which may be in his custody at the time of his removal, or when the term for which he is appointed shall expire, and for that purpose may retain such prisoners in his custody until his successor shall be appointed and qualified as the law directs").

for years in a federal prison, often had few ties to any State; it was a matter of speculation where they would choose to go upon release; and accordingly no State was enthusiastic about volunteering to shoulder the burden of civil commitment.

The Necessary and Proper Clause does not give Congress *carte blanche.* Although the term "necessary" does not mean "absolutely necessary" or indispensable, the term requires an "appropriate" link between a power conferred by the Constitution and the law enacted by Congress. See *McCulloch* v. *Maryland*, 4 Wheat. 316, 415 (1819). And it is an obligation of this Court to enforce compliance with that limitation. *Id.*, at 423.

The law in question here satisfies that requirement. This is not a case in which it is merely possible for a court to think of a rational basis on which Congress might have perceived an attenuated link between the powers underlying the federal criminal statutes and the challenged civil commitment provision. Here, there is a substantial link to Congress' constitutional powers.

For this reason, I concur in the judgment that Congress had the constitutional authority to enact 18 U. S. C. §4248.

# SUPREME COURT OF THE UNITED STATES

No. 08–1224

UNITED STATES, PETITIONER *v.* GRAYDON
EARL COMSTOCK, JR., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[May 17, 2010]

JUSTICE THOMAS, with whom JUSTICE SCALIA joins in all but Part III–A–1–b, dissenting.

The Court holds today that Congress has power under the Necessary and Proper Clause to enact a law authorizing the Federal Government to civilly commit "sexually dangerous person[s]" beyond the date it lawfully could hold them on a charge or conviction for a federal crime. 18 U. S. C. §4248(a). I disagree. The Necessary and Proper Clause empowers Congress to enact only those laws that "carr[y] into Execution" one or more of the federal powers enumerated in the Constitution. Art. I, §8, cl. 18. Because §4248 "Execut[es]" no enumerated power, I must respectfully dissent.

I

"As every schoolchild learns, our Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory* v. *Ashcroft*, 501 U. S. 452, 457 (1991). In our system, the Federal Government's powers are enumerated, and hence limited. See, *e.g.*, *McCulloch* v. *Maryland*, 4 Wheat. 316, 405 (1819) ("This government is acknowledged by all to be one of enumerated powers"). Thus, Congress has no power to act unless the Constitution authorizes it to do so. *United States* v. *Morrison*, 529 U. S. 598, 607 (2000) ("Every law enacted

by Congress must be based on one or more of its powers enumerated in the Constitution"). The States, in turn, are free to exercise all powers that the Constitution does not withhold from them. Amdt. 10 ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people").[1] This constitutional structure establishes different default rules for Congress and the States: Congress' powers are "few and defined," while those that belong to the States "remain . . . numerous and indefinite." The Federalist No. 45, p. 328 (B. Wright ed. 1961) (J. Madison).

The Constitution plainly sets forth the "few and defined" powers that Congress may exercise. Article I "vest[s]" in Congress "[a]ll legislative Powers herein granted," §1, and carefully enumerates those powers in §8. The final clause of §8, the Necessary and Proper Clause, authorizes Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." Art. I, §8, cl. 18. As the Clause's placement at the end of §8 indicates, the "foregoing Powers" are those granted to Congress in the preceding clauses of that section. The "other Powers" to which the Clause refers are those "vested" in Congress and the other branches by other specific provisions of the Constitution.

Chief Justice Marshall famously summarized Congress' authority under the Necessary and Proper Clause in *McCulloch*, which has stood for nearly 200 years as this

---

[1] "With this careful last phrase, the [Tenth] Amendment avoids taking any position on the division of power between the state governments and the people of the States: It is up to the people of each State to determine which 'reserved' powers their state government may exercise." *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779, 848 (1995) (THOMAS, J., dissenting).

Court's definitive interpretation of that text:

> "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." 4 Wheat., at 421.

*McCulloch*'s summation is descriptive of the Clause itself, providing that federal legislation is a valid exercise of Congress' authority under the Clause if it satisfies a two-part test: First, the law must be directed toward a "legitimate" end, which *McCulloch* defines as one "within the scope of the [C]onstitution"—that is, the powers expressly delegated to the Federal Government by some provision in the Constitution. Second, there must be a necessary and proper fit between the "means" (the federal law) and the "end" (the enumerated power or powers) it is designed to serve. *Ibid. McCulloch* accords Congress a certain amount of discretion in assessing means-end fit under this second inquiry. The means Congress selects will be deemed "necessary" if they are "appropriate" and "plainly adapted" to the exercise of an enumerated power, and "proper" if they are not otherwise "prohibited" by the Constitution and not "[in]consistent" with its "letter and spirit." *Ibid*.

Critically, however, *McCulloch* underscores the linear relationship the Clause establishes between the two inquiries: Unless the end itself is "legitimate," the fit between means and end is irrelevant. In other words, no matter how "necessary" or "proper" an Act of Congress may be to its objective, Congress lacks authority to legislate if the objective is anything other than "carrying into Execution" one or more of the Federal Government's enumerated powers. Art. I, §8, cl. 18.

This limitation was of utmost importance to the Framers. During the State ratification debates, Anti-

Federalists expressed concern that the Necessary and Proper Clause would give Congress virtually unlimited power.  See, *e.g.*, Essays of Brutus, in 2 The Complete Anti-Federalist 421 (H. Storing ed. 1981).  Federalist supporters of the Constitution swiftly refuted that charge, explaining that the Clause did not grant Congress any freestanding authority, but instead made explicit what was already implicit in the grant of each enumerated power.  Referring to the "powers declared in the Constitution," Alexander Hamilton noted that "it is *expressly* to execute these powers that the sweeping clause . . . authorizes the national legislature to pass all *necessary* and *proper* laws."  The Federalist No. 33, at 245.  James Madison echoed this view, stating that "the sweeping clause . . . only extend[s] to the enumerated powers."  3 J. Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 455 (2d ed. 1854) (hereinafter Elliot).  Statements by delegates to the state ratification conventions indicate that this understanding was widely held by the founding generation.  *E.g.*, *id.*, at 245–246 (statement of George Nicholas) ("Suppose [the Necessary and Proper Clause] had been inserted, at the end of every power, that they should have power to make laws to carry that power into execution; would that have increased their powers?  If, therefore, it could not have increased their powers, if placed at the end of each power, it cannot increase them at the end of all").[2]

---

[2] See also 4 Elliot 141 (2d ed. 1836) (statement of William Maclaine) ("This clause specifies that [Congress] shall make laws to carry into execution *all the powers vested* by this Constitution, consequently they can make no laws to execute any other power"); 2 *id.*, at 468 (statement of James Wilson) ("[W]hen it is said that Congress shall have power to make all laws which shall be necessary and proper, those words are limited and defined by the following, 'for carrying into execution the foregoing powers.'  [The Clause] is saying no more than that the powers we have already particularly given, shall be effectually carried into execution"); Barnett, The Original Meaning of the Necessary and

Roughly 30 years after the Constitution's ratification, *McCulloch* firmly established this understanding in our constitutional jurisprudence. 4 Wheat., at 421, 423. Since then, our precedents uniformly have maintained that the Necessary and Proper Clause is not an independent fount of congressional authority, but rather "a *caveat* that Congress possesses all the means necessary to carry out the specifically granted 'foregoing' powers of §8 'and all other Powers vested by this Constitution.'" *Kinsella* v. *United States ex rel. Singleton*, 361 U. S. 234, 247 (1960); *Carter* v. *Carter Coal Co.*, 298 U. S. 238, 291 (1936); see *Alden* v. *Maine*, 527 U. S. 706, 739 (1999); *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 326 (1816); see also *Gonzales* v. *Raich*, 545 U. S. 1, 39 (2005) (SCALIA, J., concurring in judgment) (stating that, although the Clause "empowers Congress to enact laws . . . that are not within its authority to enact in isolation," those laws must be "in effectuation of [Congress'] enumerated powers" (citing *McCulloch, supra,* at 421–422)).

## II

Section 4248 establishes a federal civil-commitment regime for certain persons in the custody of the Federal Bureau of Prisons (BOP).[3] If the Attorney General demonstrates to a federal court by clear and convincing evidence that a person subject to the statute is "sexually

---

Proper Clause, 6 U. Pa. J. Const. L. 183, 185–186 (2003); Lawson & Granger, The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause, 43 Duke L. J. 267, 274–275, and n. 24 (1993).

[3] The statute authorizes the Attorney General to petition a federal court to order the commitment of a person in BOP custody (1) who has been convicted of a federal crime and is serving a federal prison sentence therefor, (2) who has been found mentally incompetent to stand trial, or (3) "against whom all federal criminal charges have been dismissed solely for reasons related to his mental condition." 18 U. S. C. §4248(a).

dangerous,"[4] a court may order the person committed until he is no longer a risk "to others," even if that does not occur until after his federal criminal sentence has expired or the statute of limitations on the federal charge against him has run. §§4248(a), (d)–(e).

No enumerated power in Article I, §8, expressly delegates to Congress the power to enact a civil-commitment regime for sexually dangerous persons, nor does any other provision in the Constitution vest Congress or the other branches of the Federal Government with such a power. Accordingly, §4248 can be a valid exercise of congressional authority only if it is "necessary and proper for carrying into Execution" one or more of those federal powers actually enumerated in the Constitution.

Section 4248 does not fall within any of those powers. The Government identifies no specific enumerated power or powers as a constitutional predicate for §4248, and none are readily discernable. Indeed, not even the Commerce Clause—the enumerated power this Court has interpreted most expansively, see, *e.g.*, *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 37 (1937)—can justify federal civil detention of sex offenders. Under the Court's precedents, Congress may not regulate noneconomic activity (such as sexual violence) based solely on the effect such activity may have, in individual cases or in the aggregate, on interstate commerce. *Morrison*, 529 U. S., at 617–618; *United States* v. *Lopez*, 514 U. S. 549, 563–567 (1995). That limitation forecloses any claim that §4248 carries into execution Congress' Commerce Clause power, and the

———————

[4] The Act defines a "sexually dangerous person" as one "who has engaged or attempted to engage in sexually violent conduct or child molestation," and "who is sexually dangerous to others." §4247(a)(5). It further defines "sexually dangerous to others" to mean a person who "suffers from a serious mental illness" such that he would "have serious difficulty in refraining from sexually violent conduct or child molestation if released." §4247(a)(6).

Government has never argued otherwise, see Tr. of Oral Arg. 21–22.[5]

This Court, moreover, consistently has recognized that the power to care for the mentally ill and, where necessary, the power "to protect the community from the dangerous tendencies of some" mentally ill persons, are among the numerous powers that remain with the States. *Addington* v. *Texas*, 441 U. S. 418, 426 (1979). As a consequence, we have held that States may "take measures to restrict the freedom of the dangerously mentally ill"— including those who are sexually dangerous—provided that such commitments satisfy due process and other constitutional requirements. *Kansas* v. *Hendricks*, 521 U. S. 346, 363 (1997).

Section 4248 closely resembles the involuntary civil-commitment laws that States have enacted under their *parens patriae* and general police powers. Indeed, it is clear, on the face of the Act and in the Government's arguments urging its constitutionality, that §4248 is aimed at protecting society from acts of sexual violence, not toward "carrying into Execution" any enumerated power or powers of the Federal Government. See Adam Walsh Child Protection and Safety Act of 2006, 120 Stat. 587 (entitled "[a]n Act [t]o protect children from sexual exploitation and violent crime"), §102, *id.*, at 590 (statement of purpose declaring that the Act was promulgated "to protect the public from sex offenders"); Brief for United States 38–39 (asserting the Federal Government's power to "*protect the public from harm* that might result upon these prisoners' release, even when that harm might arise from conduct that is *otherwise beyond the general regulatory powers of the federal government*" (emphasis added)).

--------

[5] For the reasons explained in Part III–A–2, *infra*, the enumerated power that justifies a particular defendant's criminal arrest or conviction cannot justify his subsequent civil detention under §4248.

To be sure, protecting society from violent sexual of-fenders is certainly an important end. Sexual abuse is a despicable act with untold consequences for the victim personally and society generally. See, *e.g.*, *Kennedy* v. *Louisiana*, 554 U. S. ___, ___, n. 2, (2008) (ALITO, J., dis-senting) (slip op., at 9, n. 2, 22–23). But the Constitution does not vest in Congress the authority to protect society from every bad act that might befall it.[6]   *New York* v. *United States*, 505 U. S. 144, 157 (1992) ("'The question is not what power the Federal Government ought to have but what powers in fact have been given by the people'" (quoting *United States* v. *Butler*, 297 U. S. 1, 63 (1936)).

In my view, this should decide the question. Section 4248 runs afoul of our settled understanding of Congress' power under the Necessary and Proper Clause. Congress may act under that Clause only when its legislation "carr[ies] into Execution" one of the Federal Government's enumerated powers. Art. I, §8, cl. 18. Section 4248 does not execute *any* enumerated power. Section 4248 is there-fore unconstitutional.

## III

The Court perfunctorily genuflects to *McCulloch*'s framework for assessing Congress' Necessary and Proper Clause authority, and to the principle of dual sovereignty it helps to maintain, then promptly abandons both in favor of a novel five-factor test supporting its conclusion that §4248 is a "'necessary and proper'" adjunct to a jumble of *unenumerated* "authorit[ies]." *Ante*, at 22. The Court's newly minted test cannot be reconciled with the Clause's plain text or with two centuries of our precedents inter-

---

[6] The absence of a constitutional delegation of general police power to Congress does not leave citizens vulnerable to the harms Congress seeks to regulate in §4248 because, as recent legislation indicates, the States have the capacity to address the threat that sexual offenders pose. See n. 15, *infra.*

preting it. It also raises more questions than it answers. Must each of the five considerations exist before the Court sustains future federal legislation as proper exercises of Congress' Necessary and Proper Clause authority? What if the facts of a given case support a finding of only four considerations? Or three? And if three or four will suffice, *which* three or four are imperative? At a minimum, this shift from the two-step *McCulloch* framework to this five-consideration approach warrants an explanation as to why *McCulloch* is no longer good enough and which of the five considerations will bear the most weight in future cases, assuming some number less than five suffices. (Or, if not, why all five are required.) The Court provides no answers to these questions.

### A

I begin with the first and last "considerations" in the Court's inquiry. *Ante*, at 5. The Court concludes that §4248 is a valid exercise of Congress' Necessary and Proper Clause authority because that authority is "broad," *ibid.*, and because "the links between §4248 and an enumerated Article I power are not too attenuated," *ante*, at 18. In so doing, the Court first inverts, then misapplies, *McCulloch*'s straightforward two-part test.

### 1
#### a

First, the Court describes Congress' lawmaking power under the Necessary and Proper Clause as "broad," relying on precedents that have upheld federal laws under the Clause after finding a "'rationa[l]'" fit between the law and an enumerated power. *Ante*, at 6 (quoting *Sabri* v. *United States*, 541 U. S. 600, 605 (2004)). It is true that this Court's precedents allow Congress a certain degree of latitude in selecting the means for "carrying into Execu-

tion" an end that is "legitimate."[7] See, *e.g.*, *Jinks* v. *Richland County*, 538 U. S. 456, 462–463 (2003) (citing *McCulloch*, 4 Wheat., at 417, 421). But in citing these cases, the Court puts the cart before the horse: The fit between means and ends matters only if the end is in fact legitimate—*i.e.*, only if it is one of the Federal Government's enumerated powers.

By starting its inquiry with the degree of deference owed to Congress in selecting means to further a legitimate end, the Court bypasses *McCulloch*'s first step and fails carefully to examine whether the end served by §4248 is actually one of those powers. See Part III–A–2, *infra*.

b

Second, instead of asking the simple question of what enumerated power §4248 "carr[ies] into Execution" at *McCulloch*'s first step, the Court surveys other laws Congress has enacted and concludes that, because §4248 is related to those laws, the "links" between §4248 and an enumerated power are not "too attenuated"; hence, §4248 is a valid exercise of Congress' Necessary and Proper Clause authority. *Ante*, at 18. This unnecessarily confuses the analysis and, if followed to its logical extreme, would result in an unwarranted expansion of federal

_____

[7] JUSTICE KENNEDY concludes that the Necessary and Proper Clause requires something beyond rational-basis scrutiny when assessing the fit between an enumerated power and the means Congress selects to execute it. *Ante*, at 2–4 (opinion concurring in judgment). Other arguments regarding the degree of fit between means and end have been lodged elsewhere. See, *e.g.*, *Gonzales* v. *Raich*, 545 U. S. 1, 61 (2005) (THOMAS, J., dissenting) (arguing that, for a law to be within the Necessary and Proper Clause, it must bear an "'obvious, simple, and direct relation'" to an exercise of Congress' enumerated powers and must not subvert basic principles of federalism and dual sovereignty). But I find that debate beside the point here, because it concerns the analysis employed at *McCulloch*'s second step, see *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819), while the Court's decision today errs by skipping the first.

power.

The Court observes that Congress has the undisputed authority to "criminalize conduct" that interferes with enumerated powers; to "imprison individuals who engage in that conduct"; to "enact laws governing [those] prisons"; and to serve as a "custodian of its prisoners." *Ante*, at 9, 14. From this, the Court assumes that §4248 must also be a valid exercise of congressional power because it is "'reasonably adapted'" to *those* exercises of Congress' incidental—and thus unenumerated—authorities. See *ante*, at 15 (concluding that "§4248 is 'reasonably adapted' to Congress' power to act as a responsible federal custodian" (citation omitted)); *ante*, at 22 (concluding that "the statute is a 'necessary and proper' means of exercising the federal authority that permits Congress to create federal criminal laws, to punish their violation, to imprison violators, to provide appropriately for those imprisoned, and to maintain the security of those who are not imprisoned but who may be affected by the federal imprisonment of others"). But that is not the question. The Necessary and Proper Clause does not provide Congress with authority to enact any law simply because it furthers *other laws* Congress has enacted in the exercise of its incidental authority; the Clause plainly requires a showing that every federal statute "carr[ies] into Execution" one or more of the Federal Government's *enumerated* powers.[8]

―――――――――

[8] *McCulloch* makes this point clear. As the Court notes, *ante*, at 18–19, *McCulloch* states, in discussing a hypothetical, that from Congress' enumerated power to establish post offices and post roads "has been inferred the power and duty of carrying the mail," and, "from this implied power, has again been inferred the right to punish those who steal letters from the post office, or rob the mail." 4 Wheat., at 417. Contrary to the Court's interpretation, this dictum does not suggest that the relationship between Congress' implied power to punish postal crimes and its implied power to carry the mail is alone sufficient to satisfy review under the Necessary and Proper Clause. Instead, *McCulloch* directly links the constitutionality of the former to Congress'

Federal laws that criminalize conduct that interferes with enumerated powers, establish prisons for those who engage in that conduct, and set rules for the care and treatment of prisoners awaiting trial or serving a criminal sentence satisfy this test because each helps to "carr[y] into Execution" the enumerated powers that justify a criminal defendant's arrest or conviction.  For example, Congress' enumerated power "[t]o establish Post Offices and post Roads," Art. I, §8, cl. 7, would lack force or practical effect if Congress lacked the authority to enact criminal laws "to punish those who steal letters from the post office, or rob the mail."  *McCulloch*, *supra*, at 417.  Similarly, that enumerated power would be compromised if there were no prisons to hold persons who violate those laws, or if those prisons were so poorly managed that prisoners could escape or demand their release on the grounds that the conditions of their confinement violate their constitutional rights, at least as we have defined them.  See, *e.g.*, *Estelle* v. *Gamble*, 429 U. S. 97 (1976).

———————

enumerated power "'to establish post offices and post roads.'"  *Ibid.* (explaining that "the right to . . . punish those who rob [the mail] is not indispensably necessary to the establishment of a post office and post road," but is "essential to the beneficial exercise of th[at] power").  More importantly, *McCulloch*'s holding, as well as the holdings of this Court's subsequent decisions, make plain that congressional action is valid under the Necessary and Proper Clause only if it carries into execution one or more enumerated powers.  *Id.*, at 422 (upholding Congress' incorporation of a bank because it was a "means . . . to be employed only for the purpose of carrying into execution *the given powers*" (emphasis added)); see *Sabri* v. *United States*, 541 U. S. 600, 605 (2004) ("Congress has authority *under the Spending Clause* to appropriate federal moneys to promote the general welfare, and it has *corresponding authority* under the Necessary and Proper Clause to see to it that taxpayer dollars appropriated under that power are in fact spent for the general welfare" (emphasis added; citations omitted)); *Stewart* v. *Kahn*, 11 Wall. 493, 506–507 (1871) ("The power to pass [the Act in question] is necessarily implied from the *powers to make war and suppress insurrections*" (emphasis added) (referring to Art. I, §8, cls. 11 and 15)).

Civil detention under §4248, on the other hand, lacks any such connection to an enumerated power.

2

After focusing on the relationship between §4248 and several of Congress' implied powers, the Court finally concludes that the civil detention of a "sexually dangerous person" under §4248 carries into execution the enumerated power that justified that person's arrest or conviction in the first place. In other words, the Court analogizes §4248 to federal laws that authorize prison officials to care for federal inmates while they serve sentences or await trial. But while those laws help to "carr[y] into Execution" the enumerated power that justifies the imposition of criminal sanctions on the inmate, §4248 does not bear that essential characteristic for three reasons.

First, the statute's definition of a "sexually dangerous person" contains no element relating to the subject's crime. See §§4247(a)(5)–(6). It thus does not require a federal court to find any connection between the reasons supporting civil commitment and the enumerated power with which that person's criminal conduct interfered. As a consequence, §4248 allows a court to civilly commit an individual without finding that he was ever charged with or convicted of a federal crime involving sexual violence. §§4248(a), (d). That possibility is not merely hypothetical: The Government concedes that nearly 20% of individuals against whom §4248 proceedings have been brought fit this description.[9] Tr. of Oral Arg. 23–25.

Second, §4248 permits the term of federal civil commitment to continue beyond the date on which a convicted

_____

[9] The statute does require the court to find that the subject "has engaged or attempted to engage in sexually violent conduct or child molestation," §4247(a)(5), but that factual predicate can be established by a *state* conviction, or by clear and convincing evidence that the person committed a sex crime for which he was never charged.

prisoner's sentence expires or the date on which the stat-
ute of limitations on an untried defendant's crime has run.
The statute therefore authorizes federal custody over a
person at a time when the Government would lack juris-
diction to detain him for violating a criminal law that
executes an enumerated power.

The statute this Court upheld in *Greenwood* v. *United
States*, 350 U. S. 366 (1956), provides a useful contrast.
That statute authorized the Federal Government to exer-
cise civil custody over a federal defendant declared men-
tally unfit to stand trial only "'until the accused shall be
mentally competent to stand trial or until the pending
charges against him are disposed of according to law.'"
*Id.*, at 368, n. 2 (quoting 18 U. S. C. §4246 (1952 ed.)).
Thus, that statute's "end" reasonably could be interpreted
as preserving the Government's power to enforce a crimi-
nal law against the accused. Section 4248 (2006 ed.),
however, authorizes federal detention of a person even
*after* the Government loses the authority to prosecute him
for a federal crime.

Third, the definition of a "sexually dangerous person"
relevant to §4248 does not require the court to find that
the person is likely to violate a law executing an enumer-
ated power in the future. Although the Federal Govern-
ment has no express power to regulate sexual violence
generally, Congress has passed a number of laws proscrib-
ing such conduct in special circumstances. All of these
statutes contain jurisdictional elements that require a
connection to one of Congress' enumerated powers—such
as interstate commerce, *e.g.*, §2252(a)(2)—or that limit the
statute's coverage to jurisdictions in which Congress has
plenary authority, *e.g.*, §2243(a). Section 4248, by con-
trast, authorizes civil commitment upon a showing that
the person is "sexually dangerous," and presents a risk "to
others," §4247(a)(5). It requires no evidence that this
sexually dangerous condition will manifest itself in a way

that interferes with a federal law that executes an enumerated power or in a geographic location over which Congress has plenary authority.[10]

In sum, the enumerated powers that justify a criminal defendant's arrest or conviction cannot justify his subsequent civil detention under §4248.

## B

The remaining "considerations" in the Court's five-part inquiry do not alter this conclusion.

### 1

First, in a final attempt to analogize §4248 to laws that authorize the Federal Government to provide care and treatment to prisoners while they await trial or serve a criminal sentence, the Court cites the Second Restatement of Torts for the proposition that the Federal Government has a "custodial interest" in its prisoners, *ante*, at 22, and, thus, a broad "constitutional power to act in order to protect nearby (and other) communities" from the dangers

---

[10] The Constitution grants Congress plenary authority over certain jurisdictions where no other sovereign exists, including the District of Columbia, Art. I, §8, cl. 17, and federal territories, Art. IV, §3, cl. 2. In addition, Congress has "broad general powers to legislate in respect to Indian tribes," *United States* v. *Lara*, 541 U. S. 193, 200 (2004) (citing Art. I, §8, cl. 3; Art. II, §2, cl. 2), including certain special responsibilities over "Indian country," 18 U. S. C. §1151. Although the Necessary and Proper Clause did not authorize Congress to enact §4248, I do not rule out the possibility that Congress could provide for the civil commitment of individuals who enter federal custody as a result of acts committed in these jurisdictions. See, *e.g.*, *United States* v. *Cohen*, 733 F. 2d 128 (CADC 1984) (en banc) (upholding civil commitment of a defendant under a District of Columbia statute authorizing the institutionalization of persons acquitted by reason of insanity). Although two of the respondents in this case were either charged with or convicted of criminal acts committed in such jurisdictions, see *ante*, at 3; 507 F. Supp. 2d 522, 527, and n. 2 (EDNC 2007), that question is not presented here because §4248 does not make that fact essential to an individual's placement in civil detention.

they may pose,[11] *ante*, at 14. That citation is puzzling because federal authority derives from the Constitution, not the common law. In any event, nothing in the Restatement suggests that a common-law custodian has the powers that Congress seeks here. While the Restatement provides that a custodian has a duty to take reasonable steps to ensure that a person in his care does not cause "bodily harm to others," 2 Restatement (Second) of Torts §319, p. 129 (1963–1964), that duty terminates once the legal basis for custody expires:

> "There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> "(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> "(b) a special relation exists between the actor and the other which gives to the other a right to protection." *Id.*, §315, at 122.

Once the Federal Government's criminal jurisdiction over a prisoner ends, so does any "special relation[ship]" between the Government and the former prisoner.[12]

───────────

[11] The Court also cites *Youngberg* v. *Romeo*, 457 U. S. 307 (1982), but that case lends even less support than the Restatement. In *Youngberg*, an inmate at a state hospital argued that hospital workers violated his constitutional rights when they applied restraints to keep him in his bed at the hospital infirmary. *Id.*, at 310–311. In assessing that claim, this Court noted that the hospital had a responsibility to "protect *its residents*" from the danger of violence. *Id.*, at 320 (emphasis added). The Court never suggested that this responsibility extended to "nearby (and other) communities." *Ante*, at 14. Moreover, the hospital was a *state* institution. Nothing in *Youngberg* suggests that the Federal Government can detain a person beyond the date on which its criminal jurisdiction expires for fear that he may later pose a threat to the surrounding community.

[12] Federal law permits a sentencing court to order that a defendant be placed on a term of "supervised release" after his term of imprisonment

For this reason, I cannot agree with JUSTICE ALITO that §4248 is a necessary and proper incident of Congress' power "to protect the public from dangers created by the federal criminal justice and prison systems." *Ante*, at 3 (concurring in judgment). A federal criminal defendant's "sexually dangerous" propensities are not "created by" the fact of his incarceration or his relationship with the federal prison system. The fact that the Federal Government has the authority to imprison a person for the purpose of punishing him for a federal crime—sex-related or otherwise—does not provide the Government with the additional power to exercise indefinite civil control over that person.[13]

2

Second, the Court describes §4248 as a "modest" expansion on a statutory framework with a long historical pedigree. *Ante*, at 9. Yet even if the antiquity of a practice could serve as a substitute for its constitutionality—and the Court admits that it cannot, *ibid.*—the Court overstates the relevant history.

Congress' first foray into this general area occurred in 1855, when it established St. Elizabeth's Hospital to provide treatment to "insane" persons in the military and the

—————————

is complete. 18 U. S. C. §§3583, 3624(e). Contrary to the Government's suggestion, federal authority to exercise control over individuals serving terms of "supervised release" does not derive from the Government's "relationship" with the prisoner, see Brief for United States 38, but from the original criminal sentence itself. Supervised release thus serves to execute the enumerated power that justifies the defendant's statute of conviction, just like any other form of punishment imposed at sentencing.

[13] The fact that Congress has the authority to "provide for the apprehension of escaped federal prisoners," see *ante*, at 3 (ALITO, J., concurring in judgment), does not change this conclusion. That authority derives from Congress' power to vindicate the enumerated power with which the escaped defendant's crime of conviction interfered, not a freestanding police power.

District of Columbia. Act of Mar. 3, 1855, 10 Stat. 682. But Congress was acting pursuant to *enumerated* powers when it took this step. See Art. I, §8, cl. 17 (granting Congress plenary authority over the District of Columbia); Art. I, §8, cl. 14 (authorizing Congress to "make Rules for the Government and Regulation of the land and naval Forces"). This enactment therefore provides no support for Congress' claimed power to detain sexually dangerous persons without an otherwise valid basis for jurisdiction.

Later, Congress provided for the federal civil commitment of "insane" persons charged with or convicted of a federal crime. Act of Feb. 7, 1857, §§5–6, 11 Stat. 158; see 17 Op. Atty. Gen. 211, 212–213 (1881); Act of June 23, 1874, ch. 465, 18 Stat. 251; Act of Aug. 7, 1882, 22 Stat. 330. As the Court explains, however, these statutes did not authorize federal custody beyond the completion of the "term" of federal "imprisonment," §§2–3, 18 Stat. 252; see 35 Op. Atty. Gen. 366, 368 (1927); 30 Op. Atty. Gen. 569, 570–571 (1916); Act of May 13, 1930, ch. 254, §6, 46 Stat. 271, and thus shed no light on the question presented here.

In 1949, Congress enacted a more comprehensive regime, authorizing the civil commitment of mentally ill persons in BOP custody. See 18 U. S. C. §§4246, 4247 (1952 ed.). This Court addressed that regime in *Greenwood*, but never endorsed the proposition that the Federal Government could rely on that statute to detain a person in the absence of a pending criminal charge or ongoing criminal sentence.[14]

_____

[14] In addition, at least some courts questioned the Federal Government's power to detain a person in such circumstances. See *Dixon* v. *Steele*, 104 F. Supp. 904, 908 (WD Mo. 1952) (holding that the Federal Government lacked authority to detain an individual declared mentally unfit to stand trial once it was determined that he was unlikely to recover in time to be prosecuted); *Higgins* v. *United States*, 205 F. 2d 650, 653 (CA9 1953) (avoiding this constitutional question by interpret-

As already noted, *Greenwood* upheld the commitment of a federal defendant declared unfit to stand trial on the narrow ground that the Government's criminal jurisdiction over the defendant—its "power to prosecute for federal offenses—[wa]s not exhausted," but rather "persist[ed]" in the form of a "pending indictment." 350 U. S., at 375; see *supra*, at 16. The Court was careful to state that *"[t]his* commitment, and therefore the legislation authorizing commitment *in the context of this case*, involve[d] an assertion of authority" within "congressional power under the Necessary and Proper Clause." *Greenwood*, 350 U. S., at 375 (emphasis added). But it painstakingly limited its holding to "the narrow constitutional issue raised by th[at] order of commitment." *Ibid.*

The historical record thus supports the Federal Government's authority to detain a mentally ill person against whom it has the authority to enforce a criminal law. But it provides no justification whatsoever for reading the Necessary and Proper Clause to grant Congress the power to authorize the detention of persons without a basis for federal criminal jurisdiction.

3

Finally, the Court offers two arguments regarding §4248's impact on the relationship between the Federal Government and the States. First, the Court and both concurrences suggest that Congress must have had the power to enact §4248 because a long period of federal incarceration might "seve[r]" a sexually dangerous prisoner's "claim to 'legal residence'" in any particular State, *ante*, at 15 (opinion of the Court), thus leaving the prisoner without any "home State to take charge" of him upon release, *ante*, at 5 (KENNEDY, J., concurring in judgment);

———————

ing the statute to permit federal civil detention only for a period reasonably related to a criminal prosecution); *Wells* v. *Attorney General of United States*, 201 F. 2d 556, 560 (CA10 1953) (same).

see *ante*, at 1 (ALITO, J., concurring in judgment) (noting that many federal prisoners, "as a result of lengthy federal incarceration, no longer ha[ve] any substantial ties to any State"). I disagree with the premise of that argument. As an initial matter, States plainly have the constitutional authority to "take charge" of a federal prisoner released within their jurisdiction. See Amdt. 10 (stating that powers not delegated to the Federal Government are "reserved" to the States, and to the people). In addition, the assumption that a State knowingly would fail to exercise that authority is, in my view, implausible. The Government stated at oral argument that its "default position" is to release a federal prisoner to the State in which he was convicted, Tr. of Oral Arg. 15; see also 28 CFR §2.33(b) (2009), and neither the Court nor the concurrences argue that a State has the power to refuse such a person domicile within its borders. Thus, they appear to assume that, in the absence of 18 U. S. C. §4248, a State would take no action when informed by the BOP that a sexually dangerous federal prisoner was about to be released within its jurisdiction. In light of the plethora of state laws enacted in recent decades to protect communities from sex offenders,[15] the likelihood of such an occurrence seems quite

————————

[15] As we have noted before, all 50 States have developed "some variation" of a system "for mandatory registration of sex offenders and corresponding community notification." *Smith* v. *Doe*, 538 U. S. 84, 89–90 (2003). In addition, several States have taken further steps; some impose residency restrictions on sex offenders, see, *e.g.*, *Kennedy* v. *Louisiana*, 554 U. S. ___ , ___, n. 5 (2008) (ALITO, J., dissenting) (slip op., at 11, n. 5) (collecting statutes), and, most relevant here, 22 States have enacted involuntary civil-commitment laws substantially similar to §4248, see Ariz. Rev. Stat. Ann. §36–3701 *et seq.* (West 2009); Cal. Welf. & Inst. Code Ann. §6600 *et seq.* (West 1988 and Supp. 2010); Fla. Stat. §394.910 *et seq.* (2007); Ill. Comp. Stat. Ann., ch. 725, §205 *et seq.* (West 2008); Iowa Code §229A (2009); Kan. Stat. Ann. §59–29a01 *et seq.* (2005 and 2008 Cum. Supp.); Mass. Gen. Laws, ch. 123A (West 2008); Minn. Stat. §253B (2008 and 2009 Supp.); Mo. Rev. Stat.

remote. But even in the event a State made such a decision, the Constitution assigns the responsibility for that decision, and its consequences, to the state government alone.

Next, the Court submits that §4248 does not upset the balance of federalism or invade the States' reserved powers because it "requires accommodation of state interests" by instructing the Attorney General to release a committed person to the State in which he was domiciled or tried if that State wishes to "'assume . . . responsibility'" for him. *Ante*, at 17 (quoting §4248(d)). This right of first refusal is mere window dressing. Tr. of Oral Arg. 5 ("It is not the usual course that the State does take responsibility"). More importantly, it is an altogether hollow assurance that §4248 preserves the principle of dual sovereignty—the "letter and spirit" of the Constitution—as the Necessary and Proper Clause requires.[16]  *McCulloch*, 4

<hr />

§632.480 *et seq.* (2009 Cum. Supp.); Neb. Rev. Stat. §29–2923 *et seq.* (2008); N. H. Rev. Stat. Ann. §135–E:1 *et seq.* (West Supp. 2009); N. J. Stat. Ann. §30:4–82.4 *et seq.* (West 2008); N. M. Stat. Ann. §43–1–1 *et seq.* (2000 and Supp. 2009); N. Y. Mental Hyg. Law Ann. §10.01 *et seq.* (West Supp. 2010); N. D. Cent. Code §25–03.3–01 *et seq.* (2002 and Supp. 2009); Ore. Rev. Stat. §426.510 *et seq.* (2007); S. C. Code Ann. §44–48–10 *et seq.* (Supp. 2009); Tenn. Code Ann. §33–6–801 *et seq.* (2007); Tex. Health & Safety Code Ann. §841.001 *et seq.* (West 2009); Va. Code Ann. §37.2–900 *et seq.* (Lexis Supp. 2009); Wash. Rev. Code §71.09.010 *et seq.* (2008); Wis. Stat. Ann. §980.01 *et seq.* (West 2007 and Supp. 2009).

[16] The Court describes my argument as a claim that "§4248 violates the Tenth Amendment." *Ante*, at 16. Yet, I agree entirely with the Court that "'it makes no difference whether one views the question at issue [here] as one of ascertaining the limits of the power delegated to the Federal Government under the affirmative provisions of the Constitution or one of discerning the core of sovereignty retained by the States under the Tenth Amendment.'" *Ibid.* (quoting *New York* v. *United States*, 505 U. S. 144, 159 (1992)). Section 4248 is unconstitutional because it does not "carr[y] into Execution" an enumerated power. Therefore, it necessarily intrudes upon the powers our Constitution reserves to the States and to the people.

Wheat., at 421; *Printz* v. *United States*, 521 U. S. 898, 923–924 (1997). For once it is determined that Congress has the authority to provide for the civil detention of sexually dangerous persons, Congress "is acting within the powers granted it under the Constitution," and "may impose its will on the States." *Gregory*, 501 U. S., at 460; see Art. VI, cl. 2. Section 4248's right of first refusal is thus not a matter of constitutional necessity, but an act of legislative grace.

Nevertheless, 29 States appear as *amici* and argue that §4248 is constitutional. They tell us that they do not object to Congress retaining custody of "sexually dangerous persons" after their criminal sentences expire because the cost of detaining such persons is "expensive"— approximately $64,000 per year—and these States would rather the Federal Government bear this expense. Brief for Kansas et al. 2; *ibid.* ("[S]ex offender civil commitment programs are expensive to operate"); *id.*, at 4 ("these programs are expensive"); *id.*, at 8 ("[T]here are very practical reasons to prefer a system that includes a federal sex offender civil commitment program . . . . One such reason is the significant cost").

Congress' power, however, is fixed by the Constitution; it does not expand merely to suit the States' policy preferences, or to allow State officials to avoid difficult choices regarding the allocation of state funds. By assigning the Federal Government power over "certain enumerated objects only," the Constitution "leaves to the several States a residuary and inviolable sovereignty over all other objects." The Federalist No. 39, at 285 (J. Madison). The purpose of this design is to preserve the "balance of power between the States and the Federal Government . . . [that] protect[s] our fundamental liberties." *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 572 (1985) (Powell, J., dissenting); *New York* v. *United States*, 505 U. S., at 181. It is the States' duty to act as the "im-

mediate and visible guardian" of those liberties because federal powers extend no further than those enumerated in the Constitution. The Federalist No. 17, at 169 (A. Hamilton). The Constitution gives States no more power to decline this responsibility than it gives them to infringe upon those liberties in the first instance. *FTC* v. *Ticor Title Ins. Co.*, 504 U. S. 621, 636 (1992) ("Federalism serves to assign political responsibility, not to obscure it").

Absent congressional action that is in accordance with, or necessary and proper to, an enumerated power, the duty to protect citizens from violent crime, including acts of sexual violence, belongs solely to the States. *Morrison*, 529 U. S., at 618 ("[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime"); see *Cohens* v. *Virginia*, 6 Wheat. 264, 426 (1821) (Marshall, C. J.) (stating that Congress has "no general right to punish murder committed within any of the States").

\* \* \*

Not long ago, this Court described the Necessary and Proper Clause as "the last, best hope of those who defend ultra vires congressional action." *Printz, supra*, at 923. Regrettably, today's opinion breathes new life into that Clause, and—the Court's protestations to the contrary notwithstanding, see *ante*, at 18—comes perilously close to transforming the Necessary and Proper Clause into a basis for the federal police power that "we *always* have rejected," *Lopez*, 514 U. S., at 584 (Thomas, J., concurring) (citing *Gregory, supra*, at 457; *Wirtz*, 392 U. S., at 196; *Jones & Laughlin Steel Corp.*, 301 U. S., at 37). In so doing, the Court endorses the precise abuse of power Article I is designed to prevent—the use of a limited grant of authority as a "pretext . . . for the accomplishment of objects not intrusted to the government." *McCulloch, supra*, at 423.

I respectfully dissent.